Unified Judicial System

 

 
 Formatting provided courtesy of State Bar of South Dakota and South Dakota Continuing Legal Education, Inc.
222 East Capitol Ave.
Pierre, SD 57501-2596 
SUNDT CORP., with its principal place of business at Tucson, Arizona,
Plaintiff and Appellant,
v.
THE STATE OF SOUTH DAKOTA
by and through the SOUTH DAKOTA DEPARTMENT OF TRANSPORTATION,
a state agency located in Pierre, SD
Defendant and Appellee.
[1997 SD 91, __ NW2d __ ]
South Dakota Supreme Court
Appeal from the Eighth Judicial Circuit, Lawrence County, SD
Hon.Warren G. Johnson, Judge
#19750-Affirmed
Ronald G. Schmidt, Schmidt, Schroyer, Moreno & Dupris, Pierre, SD
Attorneys for plaintiff and appellant.
Barton R. Banks, Banks, Johnson, Colbath & Kerr, Rapid City, SD
Attorneys for defendant and appellee.
Argued Apr 29, 1997; Opinion Filed Jul 16, 1997
GILBERTSON, Justice
 [Â¶1] Sundt Corporation, a paving construction company, appeals from the trial courtâs directed verdict and dismissal of its negligence claim against the South Dakota Department of Transportation (SDDOT) and the trial courtâs refusal of its proposed jury instructions. We affirm.
FACTS AND PROCEDURE
 [Â¶2] On July 5, 1991, SDDOT awarded Sundt a paving contract for a portion of U.S. Highway 12 in Corson County between Walker and McLaughlin. The contract required Sundt to provide a gravel cushion for 20 miles of roadway, and to surface the roadway with eight-inch, nonreinforced concrete pavement. Another contractor was hired to grade the roadway prior to Sundtâs phase of the project. Sundtâs contract required that during its portion of the construction, the highway would remain open, and the shoulders of the roadway would carry public traffic and trucks hired by Sundt to haul project materials.
 [Â¶3] The grading contractor completed its contract in the fall of 1991. The grading contractor was given a change order in fall 1991 which required it to apply oil to the roadway to keep the dust down. The change order specifically provided that no oil was to be applied on the road shoulders. Sundtâs contract required construction to begin in the spring of 1992.
 [Â¶4] In early spring of 1992, when Sundtâs employees inspected the site prior to commencement of construction, they noticed that the winter runoff from the oiled road and snow bladed off the highway had seeped into the shoulders, making them soft and unstable. Sundt requested that public traffic be detoured off the highway and that its construction trucks be permitted to drive on the roadway, which would avoid the unstable shoulders and cut construction time by a claimed ten weeks. SDDOT refused to permit the rerouting of traffic, but on May 15, 1992, the SDDOT engineer signed an Extra Work Authorization No. 001 which read, in part:

Extra work is hereby agreed to and authorized for repair of unstable shoulders, as encountered, from 15 feet right or left of centerline to the inslope. Shoulders were left unsealed over the winter from the previous grading project, which allowed moisture to penetrate through the existing gravel cushion and into the top foot of subgrade.
Sundtâs subcontractor, which was hired to place the gravel cushion, was paid for making repairs to the shoulders.
 [Â¶5] A dispute arose over Sundtâs claim that SDDOT should reimburse it for additional time and expense in completing the contract, which Sundt argued was due to the problems with the shoulders. Sundtâs position was that the condition of the road shoulders impeded the efficiency of its operation by slowing optimal truck speeds, bunching trucks, [fn1]  and increasing its costs of truck repairs and maintenance. Sundt requested an additional 14 days to complete its contract and avoid liquidated damages based on lost production due to unstable shoulders. SDDOT claimed the project was slowed not by the shoulders, but because Sundt had overestimated the speed a loaded truck could travel on the shoulders, had problems with its cement plant, and had overestimated the amount of concrete its trucks legally could carry (load limits). The extension of time was denied, and SDDOT assessed liquidated damages against Sundt in the amount of $5,100.
 [Â¶6] Sundt also experienced difficulty achieving the specified entrained air [fn2]  and slump [fn3]  of the concrete contained in the contract. Sundt claimed the slump problems were due to the quality of the cement from the State Cement Plant, and requested to use another cement supplier. SDDOT claimed the problems were due to too much water in the mix and the distance trucks had to carry the cement from the plant where it was mixed to the site where it was poured. Sundt used additional equipment and changed the formula for its mix of concrete in an attempt to correct the problems. SDDOT deducted penalties of $44,562.74 against Sundt for failure to meet specified standards of entrained air and slump on sections of the poured concrete.
 [Â¶7] Sundt sued SDDOT under the provisions of SDCL 31-2-34 through -39, the statutes which govern suit on state highway construction contracts. Sundt claimed damages for extra paving costs due to unstable highway shoulders, for return of the penalties and liquidated damages assessed, and for costs of trimming the gravel cushion. It based its claim for damages on theories of negligence, breach of reasonable construction standards, breach of contractual obligations, breach of the implied obligation of good faith and fair dealing, and equitable principles (unjust enrichment). At trial, after both sides rested, the trial court directed a verdict for SDDOT on the negligence count and rejected Sundtâs proposed jury instructions. The jury returned a verdict for Sundt in the amount of $51,839 for the excessive trimming costs; that verdict is not the subject of this appeal.
 [Â¶8] On appeal, Sundt raises the following issues:

1. Whether the trial court erred in granting SDDOTâs motion for directed verdict on Sundtâs negligence claims.
2. Whether the trial court erred in refusing Sundtâs proposed jury instructions on negligence.
3. Whether the trial court erred in granting SDDOTâs motion to dismiss Sundtâs negligence claims on statute of limitations grounds.
4. Whether the trial court erred in refusing Sundtâs proposed jury instructions on breach of implied warranty.
5. Whether the trial court erred in refusing Sundtâs proposed jury instruction on differing site conditions.
 [Â¶9] We believe our recent holding in Fisher Sand & Gravel Co. v. SDDOT, 1997 SD 8, 558 NW2d 864, [fn4]  is dispositive of the negligence issues in this appeal. In that case, we held there can be no cause of action sounding in negligence unless there is a legal duty which arises independent of the duties under the contract. Id., 1997 SD 8 at Â¶ 16, 558 NW2d at 868. Whether a duty exists is a question of law, which we review de novo. Id., 1997 SD 8 at Â¶12, 558 NW2d at 867 (citing Tipton v. Town of Tabor, 538 NW2d 783, 785 (SD 1995); Bland v. Davison County, 507 NW2d 80, 81 (SD 1993)).
 [Â¶10] In the case at bar, we find no legal duty which existed outside the contract. If there was a duty to maintain the shoulders to support the heavy construction activities of Sundt, it arose solely under the contract; as in Fisher, "[o]utside the contract, there was no relationship between [the parties]." Id., 1997 SD 8 at Â¶13, 558 NW2d at 867. Moreover, Sundt appears to recognize its remedies for the unstable shoulders were in contract: by offering to modify the contract to reroute traffic off Highway 12 entirely; by attempting to instruct the jury on an agency rule that states SDDOT can modify the contract if the site conditions (i.e., the shoulders) materially differ from the anticipated conditions; and by basing its claim for negligence on shoulder conditions differing from those "represented in the plans." [fn5]  When Sundt complained, SDDOT attempted to remedy the shoulder problem under the provisions of the contract--by paying Sundtâs subcontractor under a change order to fix the shoulders. [fn6] 
 [Â¶11] There is no question that Sundt knew of the shoulder problems before it began performance of the contract. In fact, Sundt argued at trial that its preconstruction proposal to entirely detour traffic off the highway should go to the jury as proof that it tried to mitigate the damages caused by the shoulder problems. It elected to seek the benefit of the bargain by performing and now seeks to rewrite its contract based on a negligence theory to offset the detriment of its decision. [fn7]  Sundt cannot have its cake and eat it too.
 [Â¶12] Sundt concedes that SDDOT never breached the contract when it stated in its rebuttal brief that, "[t]here simply was no breach of any express or implied provisions of the contract between Sundt and the SDDOT." (emphasis original). From a review of this record, we agree.
 [Â¶13] This record is replete with evidence that Sundtâs bid would have required impossible production. Each of its fully loaded, 50,000 lb. trucks would have had to drive at least 55 m.p.h. through a narrowed roadway, with one lane of traffic on the graveled shoulder--this in spite of the fact that the posted speed limit in the construction zone pursuant to the contract was a maximum of 40 m.p.h. Further, testimony indicated Sundtâs bid contemplated hauling ten cubic yards of concrete per truck when the legal load limits on the road were seven and one half cubic yards. There was also evidence that Sundt underestimated the average number of days it would not be able to work due to inclement weather in South Dakota.
 [Â¶14] It was not error for the trial court to direct a verdict for SDDOT on the issue of negligence. There can be no negligence absent a duty. Because we determine that as a matter of law SDDOT owed no duty outside its contract with Sundt, there can be no facts sufficient to sustain a verdict of negligence and no need to instruct the jury on a theory of negligence. See High Plains Genetics Research, Inc. v. JK Mill-Iron Ranch, 535 NW2d 839, 842-3 (SD 1995) (trial court erred in failing to issue a directed verdict and in instructing jury on fiduciary duty when no such duty existed as matter of law). Because the directed verdict was properly granted, we need not address the negligence jury instruction or statute of limitations issues.
 [Â¶15] 4. Whether the trial court erred in refusing Sundtâs proposed jury instructions on breach of implied warranty.
 [Â¶16] 5. Whether the trial court erred in refusing Sundtâs proposed jury instruction on differing site conditions.
 [Â¶17] Initially, SDDOT argues that Sundt has not preserved these jury instruction issues for appeal by failing to object when the trial court rejected Sundtâs proposed jury instructions. Sundt was required to object to the refusal to give the instruction and give its reasons for an objection.

SDCL 15-6-51(b) governs procedures for settlement of jury instructions at trial and provides, in relevant part, that "no grounds of objection to the giving or the refusing of an instruction shall be considered either on motion for new trial or appeal, unless presented to the court upon the âsettlementâ of such instruction." This statute also requires that "each counsel, or party, shall specify and state the particular ground or grounds" for objection and that a general objection is insufficient. An objection must be clear so the trial court is advised of what possible errors exist and be granted the opportunity to correct any instructions.
Knudson v. Hess, 1996 SD 137, Â¶11, 556 NW2d 73, 77 (emphasis added). See also Sybesma v. Sybesma, 534 NW2d 355, 359 (SD 1995); Keller v. Merkel, 73 SD 477-78, 44 NW2d 208 (1950) (jury instructions not appealable when no exceptions were taken to any instruction of the court nor did the defendant except to the refusal of the court to give requested instructions); Pulla v. Amoco Oil Co., 882 FSupp 836, 858 (SDIowa 1994), affâd in part and revâd in part, 72 F3d 648 (8th Cir 1995) (offering an alternate instruction without formal objection will not preserve error for appeal); Johnson v. Houser, 704 F2d 1049, 1051 (8thCir 1983) (the mere tender of an alternative instruction without objection to some specific error in the trial court's charge of explaining why the proffered instruction better states the law does not preserve any error for appeal); Knight v. Caldwell, 970 F2d 1430, 1433 (5thCir 1992), cert. denied, Knight v. Walker, 507 US 926, 113 SCt 1298, 122 LEd2d 688 (1993) (defendant's submission of a proposed jury instruction did not constitute a sufficient objection to the instructions given, and any error with respect to the instructions was waived); C. Wright & A. Miller, 9A Federal Practice & Procedure Â§ 2554 (1995 & Supp 1997).
 [Â¶18] The trial court invited Sundt to make its objections on the record, [fn8]  yet Sundt failed to do so on the record. Sundt informed us at oral argument that its position was stated to the trial court outside the record prior to a final settling of instructions. Based on the state of the record before us, we cannot tell whether the trial court was adequately informed by Sundt of the basis of the courtâs alleged error. However the trial court did note on the refused instructions that Sundtâs exception was allowed. Although this comes perilously close to a procedural default on the part of Sundt, we conclude that given the uncertain state of the record, we will accept the trial court notation on the refused instructions at face value that proper procedures were followed on the settling of instructions and hold the issue on the merits was preserved for appeal.
 [Â¶19] Our review of the trial courtâs refusal to give requested jury instructions is well-settled:

On issues supported by competent evidence in the record, the trial court should instruct the jury. The trial court is not required to instruct on issues lacking support in the record. Failure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial. The burden of demonstrating prejudice in failure to give a proposed instruction is on the party contending error.
Kuper v. Lincoln-Union Elec. Co., 1996 SD 145, Â¶32, 557 NW2d 748, 758 (internal citations omitted).
 [Â¶20] The linchpin of Sundtâs claim of entitlement to the implied warranty of accuracy instruction is Mooneyâs, Inc. v. SDDOT, 482 NW2d 43 (SD 1992). In Mooneyâs, we recognized the existence of an implied warranty of accuracy, defined as:

Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work.
Id. at 45 (citing United States v. Spearin, 248 US 132, 136, 39 SCt 59, 63 LEd 166 (1918)).
 [Â¶21] In Mooneyâs, the construction company alleged a violation of implied warranty of accuracy based on the stringent requirements of its construction contract with the SDDOT. Mooneyâs claimed that by providing it with gravel pit sampling data, SDDOT warranted that the gravel taken from the pit would meet contract specifications. This argument was advanced in spite of specific disclaimer language in the gravel pit data. In Mooneyâs, we upheld a summary judgment for SDDOT on the implied warranty issue because the construction contract was unambiguous and:

In allocating ... risk, courts have universally applied a rule first expounded in a line of Supreme Court cases. The rule provides that the government is not liable to a contractor for breach of implied warranty unless it misrepresents material facts through concealment or false statements. In essence, this rule established that no implied warranty will arise when the government, in good faith, presents all the information it has on ... conditions to the contractor.
Id. at 46. As in Mooneyâs, Sundt has not alleged SDDOT made any misrepresentation through concealment or false statements of material fact. Further, the record reveals no competent evidence to support concealment or false statements; therefore, the trial court correctly refused to instruct the jury on Sundtâs theory of implied warranty of accuracy.
 [Â¶22] The trial court also did not err in refusing Sundtâs proposed instruction on differing site conditions. "A trial court must present only those instructions to the jury which are supported by competent evidence and set forth the applicable law." State v. Johnson, 320 NW2d 142, 147 (SD 1982). In the instant case, the disputed jury instruction, No. 9, read as follows:

You are instructed that a differing site condition is defined by the Department of Transportation as a subsurface or latent physical condition encountered on the project which differs materially from that indicated in the contract, or an unknown physical condition of an unusual nature which differs materially from that ordinarily encountered and generally recognized as inherent in the work provided for in the contract. If you find that the shoulders designed to carry the public and construction traffic during construction of the project was a differing site condition from that anticipated by Sundt at the time of the bid, and that the condition caused an increase in the costs and/or time required by Sundt for the performance of the work under the contract you may award Sundt additional compensation for such additional costs incurred as a result of the shoulder conditions.
(Emphasis added.)
 [Â¶23] It was not error for the trial court to reject this instruction, since it states in an uncontroverted manner a disputed fact: whether the road shoulders were designed to carry public and construction traffic. The following exchange occurred at trial between SDDOT counsel and Paul Ochs, Sundtâs project engineer for the Highway 12 construction:

Counsel: The shoulder is described in the specification as the nondriving portion of the roadway.
Ochs: Yes.
Counsel: Fair statement?
Ochs. Yes.
Counsel: You read that in the specs, didnât you?
Ochs: That is the definition.
Counsel: So then basically what you have on the shoulders that is originally designed as a nontraveled portion of the roadway, youâre going to have basically a gravel road in that sense?
Ochs: The overbuilt portion of it was gravel material.
(Emphasis added.)
 [Â¶24] Based on the language of the jury instruction, and the questions of SDDOT counsel, the parties obviously disputed whether the shoulders were designed to carry public and construction traffic. [fn9]  SDDOT claims that the shoulders were never designed to carry traffic and inherently would require regular maintenance regardless of the water seepage. Sundt claims that when SDDOT required Sundt (through its subcontractor, Fisher) to extend the shoulders, the overbuilt shoulders were designed to carry the traffic without the kind of maintenance actually necessitated. Clearly SDDOT would have been prejudiced by this instruction, since it would have taken the issue of fault from the jury and left only the issue of damages. [fn10] 
 [Â¶25] We conclude that the trial court properly rejected the instructions proposed by Sundt, and we affirm the trial court on this issue.
 [Â¶26] We accordingly affirm the trial court in full.
 [Â¶27] MILLER, Chief Justice, and AMUNDSON and KONENKAMP, Justices, concur.
 [Â¶28] SABERS, Justice, dissents.
SABERS, Justice (dissenting).
 [Â¶29] I dissent on the basis of my writing in Fisher Sand & Gravel Co. v. State ex rel SD Depât of Transp., 1997 SD 8, Â¶Â¶24-41, 558 NW2d 864, 870-73 (Sabers, J., dissenting).
Footnotes
fn1 . Bunching of trucks interrupts cycling, which is the time during which the truck picks up the concrete, drives to the paving equipment, dumps the concrete, drives back, gets another load of concrete, and leaves the plant again. Truckers on the project were subcontracted by Sundt by the hour.
fn2 . Entrained air is necessary for the concrete to maintain proper expansion for freeze and thaw. If the air content is too low, the concrete deteriorates.
fn3 . Slump involves the amount of moisture in the concrete. Too much slump causes weakening of the concrete.
fn4 . Fisher was the subcontractor aggregate supplier for Sundt on the same highway project that is the subject of this appeal.
fn5 . Plans are part of a SDDOT construction contract. By its terms, the contract considers as one instrument the invitation for bids, proposal, contract form and contract bond, specifications, supplemental specifications, special provisions, general and detailed plans, notice to proceed, addenda, change orders, and agreements that are required to complete construction, including authorized extensions of time.
fn6 . Change orders are also part of a SDDOT construction contract. See note 5, supra.
fn7 . Sundt received the contract price less the penalties, plus a $100,000 bonus for smooth pavement. It sought an additional $471,500 under its negligence theory.
fn8 . Trial court to Sundtâs counsel: â[I] intend to deny 1 through 9 [4-9 are the disputed instructions] so I will let you make whatever record you wish.â
fn9 . In fact, Sundtâs witnesses admitted that the purpose of a road shoulder is not to carry heavy traffic.
fn10 . Beyond this, Sundtâs claim is based on ARSD 70:07:05:03, which deals with SDDOT construction contracts and their modification. As previously noted, Sundt concedes, and we independently agree, there were no breaches of the construction contract other than the trimming costs awarded Sundt, which are not a subject of this appeal.